1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL LEON WILLIAMS,

Plaintiff,

v.

STATE OF NEVADA, *et al.*,

Defendants.

Case No. 3:22-CV-00430-CLB

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[ECF No. 75]

10

11

12

13

This case involves a civil rights action filed by Plaintiff Michael Leon Williams ("Williams") against Defendants John Keast and Melissa Mitchell (collectively referred to as "Defendants"). Currently pending before the Court is Defendants' motion for summary judgment.[1] (ECF No. 75.) For the reasons stated below, Defendants' motion is granted.

14

**I.    BACKGROUND**

15

**A.    Procedural History**

16

17

18

19

20

21

Williams is an inmate in the custody of the Nevada Department of Corrections ("NDOC") housed at Northern Nevada Correctional Center ("NNCC"). (ECF No. 3 at 1.) At some point Williams was diagnosed with benign prostatic hyperplasia ("BPH"), and in May 2021 he was prescribed Tamsulosin, which is a generic version of Flomax. (ECF Nos. 77-1 at 219, 262; 77-2 at 7.) BPH causes the prostate to swell which can obstruct the urethra making it difficult to urinate resulting in urinary retention. (ECF No. 77-2 at 7.)

22

23

24

25

26

27

Williams filed a *pro se* civil rights complaint under 42 U.S.C. § 1983 alleging medical officials failed to timely refill his Tamsulosin prescription on several occasions despite his requests. (ECF No. 3 at 1, 4.) As a result, Williams alleges he was unable to urinate and had to be catheterized. (*Id.* at 4.) Williams further alleges that medical officials failed to timely replace his drainage bag and catheter despite his requests, which resulted in a painful infection. (*Id.*) The Court screened Williams' complaint pursuant to 28 U.S.C.

28

---

[1]    Williams opposed, (ECF No. 84), and Defendants replied, (ECF No. 88).

§1915(a) and, based on the allegations in his complaint, the Court permitted him to proceed on a single theory of liability: that Defendants were deliberately indifferent to Williams' serious medical needs in violation of the Eighth Amendment.[2] (*Id.* at 5-6.)

## B.    Factual Summary[3]

### 1.    Keep On Person Designation

Prescriptions issued by NDOC staff may be designated keep on person ("KOP"). (ECF No. 75-4 at 3; *see also* ECF No. 75-8.) If an offender receives a prescription designated KOP, they are required to maintain the entire supply on their person (or in their cell) and self-administer the medication. (ECF No. 75-4 at 3.) In 2021, NDOC's central pharmacy did not automatically issue refills for prescriptions designated KOP. (*Id.*) Rather, the offender was personally responsible for requesting a refill or scheduling an appointment for renewal. (*Id.*) To do so, an offender was required to either submit an inmate request form (kite) or make a verbal request to medical staff if they were already scheduled for an appointment. (*Id.*) Kites requesting refills were forwarded to NNCC's pill room where a nurse would triage the kite. (*Id.*) If the offender had refills remaining, a request would be submitted to NDOC's central pharmacy. (*Id.*) If the offender did not have refills remaining, the kite would be forwarded to scheduling to setup an appointment with a provider. (*Id.*)

### 2.    Initial Tamsulosin Prescription

On May 12, 2021, Williams was prescribed a 90-day supply of 0.4mg Tamsulosin to be taken once daily at bedtime. (ECF Nos. 77-1 at 219, 262; 77-3 at 2.) The parties dispute whether this prescription was designated KOP. (*See* ECF Nos. 75 at 3; 84 at 6.) A review of Williams' records shows there is no clear KOP designation as Defendants suggest. (*See* ECF No. 77-1 at 219, 262.) Williams' prescription was entered into NDOC's

---

[2]    After litigation commenced, the Court granted Williams' request for appointment of counsel. (ECF No. 42.) Pro bono counsel was appointed in July 2024 and continues to represent Williams at this time. (ECF No. 44.)

[3]    The facts presented herein are undisputed unless otherwise noted.

pharmacy software ("CIPS") the same day. (ECF Nos. 77-3 at 2; 75-4 at 4.) For reasons unclear from the record, Williams' prescription was later reduced from a 90-day supply to a 30-day supply. (ECF Nos. 77-3 at 2; 75-4 at 4.) The central pharmacy filled Williams' prescription on May 25, 2021, and the NNCC pill room received it on May 27, 2021. (ECF Nos. 77-3 at 2-3; 75-4 at 4.)

Once a prescription was delivered to the pill room, how an offender received their medication depended on where they were housed within NNCC. Offenders in general population were expected to pickup their prescriptions on their assigned day. (ECF Nos. 75-4 at 4; 75-6 at 3; 75-9 at 14; 75-10 at 46.) If, however, an offender was in segregation, a nurse would deliver the prescription directly to the inmate. (ECF Nos. 75-4 at 4; 75-6 at 3; 75-8 at 3; 75-9 at 14; 75-10 at 92.) Pickups and deliveries were recorded in a physical "KOP Log" separately maintained by the NNCC pill room. (ECF Nos. 75-4 at 4; 77-3 at 8-38.)

Defendants assert there is no record Williams ever picked up his prescription relying on Christy Coss's ("Coss") declaration. (ECF No. 75 at 4; *see also* ECF No. 75-4 at 3.) However, the KOP log attached to Defendants' motion as Exhibit E — which Coss stated she reviewed — does not include any reports from May or June 2021. (S*ee* ECF No. 77-3 at 8-38.) Thus, the Court has no way of verifying one way or the other whether Williams picked up his prescription. However, Coss testified in her deposition that the lack of a notation in the KOP log does not necessarily mean the prescription was not picked up. (ECF Nos. 84 at 7; 84-7 at 4.),

### 3.    Subsequent Refills

On June 13 and 14, 2021, Williams submitted two kites requesting an examination due to pain stemming from prostate complications. (ECF No. 77-1 at 86-87.) However, there is nothing in the record indicating Williams sought to refill his Tamsulosin prescription that month. (ECF Nos. 75 at 4-5; 84 at 3.) On July 8, 2021, Williams was seen by a provider in response to these kites. (ECF No. 77-1 at 262.) The provider noted Williams was non-compliant with his medications, but did not note which medications

specifically. (*Id.*) Williams was prescribed a 180-day supply of Tamsulosin, and the dosage was increased to 0.4mg twice daily. (*Id.* at 218.) Williams' prescription was clearly designated as KOP. (*Id.*) Williams' prescription was entered into CIPS that day and again reduced to a 30-day supply by the central pharmacy for reasons not clear from the record. (ECF No. 77-3 at 2.) The central pharmacy filled Williams' prescription on July 9, 2021, and the NNCC pill room received it on July 10, 2021. (*Id.* at 4.)

Defendants assert there is no record that Williams picked up his prescription, again relying on Coss's declaration. (ECF No. 75 at 5.) But like with Williams' initial prescription, the KOP logs do not include any reports from the month of July so there is no way to know one way or the other. (*See* ECF No. 77-3 at 8-38.) And, as mentioned above, Coss testified in her deposition that the lack of a notation in the KOP log does not mean the prescription was not picked up. (ECF No. 84-7 at 4.)

The following month, on August 5, 2021, a provider directed medical staff to refill Williams' medications. (ECF No. 77-1 at 261.) NDOC's central pharmacy filled another 30-day supply of Tamsulosin on August 9, 2021, which the NNCC pill room received on August 13, 2021. (ECF No. 77-3 at 4.) On August 17, 2021, Williams was transferred to the segregation unit. (ECF No. 75-1 at 4.) As such, staff was required to deliver the refill to Williams, (ECF No. 75-8 at 3), which they did on August 20, 2021, (ECF No. 77-3 at 8).

There is no evidence in the record Williams requested a refill of his Tamsulosin in September 2021. However, in his declaration, Williams states he consistently requested refills in September and October 2021 on inmate request forms, but that he did not receive copies of them, and that they do not appear in his medical file. (ECF No. 84-11 at 2.) The record does reflect that Williams requested a refill on October 24, 2021, (ECF No. 77-1 at 78), which the central pharmacy filled on October 27, 2021, (ECF No. 77-3 at 4), and the NNCC pill room received on October 29, 2021, (*id.*). The notation in the KOP log is unclear as to when the refill was delivered to Williams, (*id.* at 9), but the parties agree it was on or before November 8, 2021, (ECF Nos. 75 at 5; 84 at 3).

On December 6, 2021, Williams submitted a kite requesting a refill of his Tamsulosin noting he was "currently without." (ECF No. 77-1 at 66.) Two days later, Williams was seen by a provider. (*Id.* at 258.) It appears Williams verbally requested a refill of his Tamsulosin because the notes state: "54 y/o male req renewal of Tamsulosin and Baclofen." (*Id.*) However, a few lines down the provider noted: "no meds due for renewal." (*Id.*) In any event, whether because of the kite or verbal request, the central pharmacy refilled Williams' Tamsulosin prescription on December 14, 2021, and the NNCC pill room received the refill on December 18, 2021. (ECF No. 77-3 at 4.) Coss states in her declaration that the refill was delivered to Williams on or before December 20, 2021. (ECF No. 75-4 at 5.) However, the KOP log she purports to rely on contains no notation as to when the prescription was delivered. (ECF No. 77-3 at 10.)

Williams next kited for a refill on January 2, 2022, noting that because his previous refill was "renewed late, [he] ended up with a [catheter]" and "might need surgery." (ECF No. 77-1 at 67.) The central pharmacy refilled his prescription on January 6, 2022, (ECF No. 77-3 at 5), the NNCC pill room received it on January 11, 2022, (*id.*), and Williams, received his refill on January 13, 2021, (ECF No. 77-3 at 13).

The parties do not discuss, nor dispute, any of Williams' subsequent refills other than in July 2022, during which Williams claims he was never given a refill. (ECF No. 84 at 4.) On June 15, 2022, Williams submitted a kite requesting a refill of his Tamsulosin before he ran out. (ECF No. 77-1 at 45.) The central pharmacy refilled Williams' prescription on June 17, 2022, and the NNCC pill room received it on June 23, 2022. (ECF No. 77-3 at 6.) The KOP log shows the refill was delivered to Williams in segregation on June 29, 2022. (*Id.* at 23.)

### 4.    Foley Catheter Insertion and Urinary Tract Infection

Williams was seen by Defendant Melissa Mitchell ("Mitchell") on December 16, 2021, with complaints of urinary retention. (ECF Nos. 77-1 at 214, 260; 75-7 at 3; 75-11 at 39-41.) Williams indicated he had been out of Tamsulosin for 10 days, and Mitchell "reinforced timely kiting." (ECF Nos. 77-1 at 260; 75-7 at 3.) Mitchell discussed Williams'

1    complaint with a provider, who entered verbal orders for renewal of Williams's Tamsulosin

2    prescription, additional testing, and placement of an indwelling foley catheter to be

3    removed in one week.

4          A foley catheter is a device inserted through the urethra for purposes of draining

5    urine from the bladder. (ECF No. 77-2 at 43.) A catheter is considered indwelling if it is

6    intended to remain inserted on a long-term basis. (*Id.*) Generally, patients are issued two

7    separate collection bags — a leg bag and a night bag. (ECF No. 75-11 at 47.) A night bag

8    hangs on the patient's bed while they sleep, whereas a leg bag is a discrete bag worn

9    around their leg for when they are active during the day. (*Id.*) As a general matter, foley

10   catheters may be left in the patient for up to a month. (ECF No. 77-2 at 7.)

11         Mitchell placed the catheter and drained over 500cc of clear, yellow urine. (ECF

12   Nos. 77-1 at 260; 75-7 at 3; 75-11 at 39.) A sample of the drained urine was sent for

13   culture and sensitivity testing, and a lab report dated December 19, 2021, showed the

14   sample tested positive for E. Coli. (ECF Nos. 77-1 at 133, 260; 75-11 at 40.) The parties

15   dispute whether Williams was given both a day and night bag, and whether Mitchell

16   discussed his plan of care with him. Defendants assert "Mitchell issued leg and night bags

17   and discussed the plan of care with Williams, who noted his understanding," citing to

18   Williams' medical records. (ECF No. 75 at 7.) The order in Williams' record has a note to

19   "issue leg/noc bag" with a checkmark and the word "done" written next to it. (ECF No. 77-

20   1 at 214.) Furthermore, the progress notes state "discussed poc [plan of care] & pt stated

21   understanding," and "leg bag – noc bag issued." (*Id.* at 260.) Mitchell reaffirmed that she

22   issued both bags and discussed Williams' plan of care with him in her declaration and

23   deposition. (ECF Nos. 75-7 at 3-4; 75-11 at 40.)

24         However, in his declaration, (ECF No. 84-11 at 3), Williams asserts he was only

25   given one bag and not given instructions on how to care for his catheter:

26         On December 16, 2021, when Defendant Melissa Mitchell placed my foley
           catheter, I did not receive two drainage bags. I received only one drainage
27         bag at that time, which I understand to be the smaller, day bag and not the
           larger overnight bag. Additionally, I did not receive any instructions on how
28         to properly care for the catheter, the insertion site, or the supplies to do so.

Finally, I was not given education regarding what to look for in terms of further infection, irritation of the insertion site, or other complications due to catheter insertion and use.

### 5.    Man Down on December 20, 2021, and Follow-Up with Dr. Halki

On December 20, 2021, Williams called a man down for "pain in [his] bladder." (ECF No. 77-1 at 271.) The responding nurse noted Williams "had discharge from [his] penis around catheter," and his "urine bag had [a] moderate amount of blood present." (*Id.*) The nurse contacted Dr. John Halki, who ordered a urine culture, a prescription for Bactrim (an antibiotic), and a follow-up at the clinic the next day. (*Id.*) Another urine test was ordered at that time, and a report dated December 24, 2021, again showed the sample tested positive for E. Coli. (*Id.* at 131.)

The following day, which was also five days after the catheter was placed, Dr. Halki saw Williams. (*Id.* at 227, 258.) Dr. Halki ordered Bactrim once daily for fourteen days, and for the catheter to remain in place until he received Williams' urine results. (*Id.*) If there was no infection, the catheter would be removed for a voiding trial; if Williams failed the voiding trial the catheter would be replaced until he could be seen by urology. (*Id.*) A separate provider subsequently switched Williams to Augmentin instead of Bactrim, noting the previous urine results showed the E. Coli was resistant to Bactrim. (*Id.*)

### 6.    Man Down on December 28, 2021

On December 28, 2021, Williams called a man down due to a swollen testicle and difficulty walking. (ECF No. 77-1 at 272.) The responding nurse reported "dark cloudy urine in foley bag," "crust around glans [and] tubing," and a "hard" "grapefruit size" left testicle. (*Id.*) The nurse contacted Dr. Halki, who ordered the nurse to ensure Williams had been switched from Bactrim to Augmentin, to remove the catheter, and provide scrotal support. (*Id.* at 227, 272.) Accordingly, the nurse removed the catheter, performed a voiding trial, and gave Williams a jock strap. (*Id.* at 272.) Williams was scheduled for a follow-up on January 5, 2021, but for reasons not clear from the record, he did not show up. (*Id.* at 258.)

There is no record Williams had another catheter placed after this incident, or that

1    Williams submitted any kites indicating his catheter bags had begun leaking or required
2    replacement. Similarly, there is no evidence in the record that prior to Williams' calling a
3    man down on December 28, 2021, there was any kite indicating William's catheter had
4    become blocked or encrusted. Furthermore, the parties agree it was not within the scope
5    of registered nursing practice to remove or replace a catheter without a physician's order,
6    or with a physician's order to the contrary. (ECF Nos. 75 at 8; 84 at 6.)

7    **II.    LEGAL STANDARD**

8        "The court shall grant summary judgment if the movant shows that there is no
9    genuine dispute as to any material fact and the movant is entitled to judgment as a matter
10   of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The
11   substantive law applicable to the claim or claims determines which facts are material.
12   *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477
13   U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of
14   the suit can preclude summary judgment, and factual disputes that are irrelevant are not
15   material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine"
16   only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at
17   248.

18       The parties subject to a motion for summary judgment must: (1) cite facts from the
19   record, including but not limited to depositions, documents, and declarations, and then
20   (2) show "that the materials cited do not establish the absence or presence of a genuine
21   dispute, or that an adverse party cannot produce admissible evidence to support the fact."
22   Fed. R. Civ. P. 56(c)(1)(B). "A party may object that the material cited to support or dispute
23   a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ.
24   P. 56(c)(2). Conclusory statements, speculative opinions, pleading allegations, or other
25   assertions uncorroborated by facts are insufficient to establish the absence or presence
26   of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.
27   2007); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

28       The moving party bears the initial burden of demonstrating an absence of a

genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. However, if the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its burden for summary judgment, the nonmoving party is not required to provide evidentiary materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477 U.S. at 322-23.

Where the moving party has met its burden, however, the burden shifts to the nonmoving party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation omitted). In other words, the nonmoving party may not simply rely upon the allegations or denials of its pleadings; rather, they must tender evidence of specific facts in the form of affidavits and/or admissible discovery material in support of their contention that such a dispute exists. *See* Fed. R. Civ. P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The nonmoving party "must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving

1   party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*,

2   627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will

3   not defeat a properly supported and meritorious summary judgment motion. *Matsushita*,

4   475 U.S. at 586-87.

5   **III.    DISCUSSION**

6          Defendants argue they are entitled to summary judgment because: (1) Williams

7   cannot establish a violation of the Eighth Amendment; (2) Defendants did not personally

8   participate assuming there was a violation; and, in any event, (3) Defendants are entitled

9   to qualified immunity. (ECF No. 75 at 10-19.) In the event the Court disagrees, Defendants

10  also argue Williams is not entitled to punitive damages. (*Id.* at 19.) Before addressing

11  these arguments, however, the Court will first address the scope of Williams' complaint

12  since the parties disagree about what claims are proceeding in this action.

13         **A.    Scope of Complaint**

14         In his opposition, Williams discusses issues with getting his Tamsulosin

15  prescription refilled in July 2022, as well as not receiving the correct number of catheter

16  bags nor information about how to care for his catheter. (ECF No. 84 at 14-16.) In their

17  reply, Defendants argue Williams' complaint does not contain any allegations regarding

18  his Tamsulosin prescription in July 2022, nor allegations that he did not receive the correct

19  number of bags or proper information. (ECF No. 88 at 7-10.) Defendants therefore argue

20  those claims are not properly before the Court. (*Id.*)

21         Federal Rule of Civil Procedure 8(a)(2) provides that "[a] pleading that states a

22  claim for relief must contain a short and plain statement of the claim showing that the

23  pleader is entitled to relief." "Specific facts are not necessary; the statement need only

24  'give the defendant fair notice of what the . . . claim is and the grounds upon which it

25  rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*,

26  550 U.S. 544, 555 (2007)). *Pro se* pleadings must be construed liberally. *Thomas v.*

27  *Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, "*pro se* litigants are [nevertheless]

28  bound by the rules of procedure." *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995); *see*

*also United States v. Merrill*, 746 F.2d 458, 465 (9th Cir. 1984), *overruled on other grounds by United States v. Hanna*, 293 F.3d 1080 (9th Cir. 2002). Thus, although the Court construes Williams' complaint liberally, the complaint must nevertheless make a sufficient showing so as to provide Defendants with fair notice.

Williams' complaint, construed liberally, provides no notice that he is alleging issues with his Tamsulosin prescription in July 2022. Williams alleges that in "the middle of 2021" he began to have prostate issues, which ultimately culminated in him having a catheter placed on December 16, 2021. (ECF No. 4 at 5-6.) Indeed, Williams states in his complaint that "what ultimately led[] [him] to . . . file this lawsuit" was him going "mandown" on December 16, 2021 — *i.e.*, when he had the catheter placed. (ECF No. 4 at 6.) Thus, the clear focus of Williams' complaint is the events between May and December 2021. The only discussion of the period after December 2021 is about the grievance Williams filed on January 1, 2022, about his man down on December 16, 2021, and his subsequent appeals through the grievance process. (*Id.* at 5.) The Court finds this is insufficient to provide Defendants with the requisite notice. Accordingly, any issues with Williams' Tamsulosin in July 2022 are not properly before the Court.

As to the catheter, Williams' complaint, construed liberally, does not allege he received the wrong number of drainage bags or that Mitchell failed to give him sufficient information to care for his catheter. Rather, Williams alleges he submitted numerous requests to have his catheter changed during the 12 days it was in but was ignored. (ECF No. 4 at 6.) As a result, Williams alleges he developed a painful infection. (*Id.*) Furthermore, Williams specifically claims Mitchell was deliberately indifferent because she failed to replace his catheter and drainage bag, something he asserts she should have been doing daily. (*Id.* at 7-8.) Clearly, then, Williams' complaint is focused on the replacement of his catheter and bag, and not on the information or quantity of drainage bags he received. Accordingly, whether Williams received the correct number of bags or proper information about caring for his catheter is not properly before the Court.

Having entered his appearance more than a year ago (July 2024), Williams'

1    counsel had ample time to seek leave to file an amended complaint if discovery revealed

2    additional claims that could be raised. (*See* ECF No. 44.) Having failed to do so, however,

3    he cannot "slink in a new claim at summary judgment." *Wolf v. Univ. Pro. & Tech. Emps,*

4    *Commc'ns Workers of Am. Loc. 9119*, 2020 WL 6342934, at *4 (N.D. Cal. 2020); *see also*

5    *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000); *Pickern v. Pier 1*

6    *Imps. (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006). Accordingly, the only issues properly

7    before the Court are Williams' Tamsulosin prescriptions between May and December

8    2021 and the alleged failure to replace his catheter and drainage bags.

9        **B.    Personal Participation**

10       The Court will first address Defendants' argument that they are entitled to summary

11   judgment because, to the extent there were any constitutional violations, they did not

12   personally participate. (ECF No. 75 at 14-16.)

13       "Liability under section 1983 arises only upon a showing of personal participation

14   by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Fayle v.*

15   *Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). Supervisors may only be held liable if they

16   "participated in or directed the violations, or knew of the violations and failed to act to

17   prevent them." *Id.* To establish the necessary causal connection, the plaintiff must show

18   the supervisor set "in motion a series of acts by others or by knowingly refusing to

19   terminate a series of acts by others, which the supervisor knew or reasonably should have

20   known would cause others to inflict a constitutional injury." *Rodriguez v. Cnty. of Los*

21   *Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (citation modified) (quoting *Starr v. Baca*, 652

22   F.3d 1202, 1207 (9th Cir. 2011)).

23       With respect to grievances, the denial of a grievance ordinarily does not amount

24   to personal participation. *McNeil v. Gittere*, 2023 WL 3615348, at *3 (D. Nev. 2023) (first

25   citing *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); and then citing *Shehee v.*

26   *Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)); *see also May v. Williams*, 2012 WL 1155390,

27   at *3 (D. Nev. 2012); *Gates v. LeGrand*, 2020 WL 3867200, at *5 (D. Nev. 2020); *Tipton*

28   *v. Guice*, 2021 WL 76720, at *1 (D. Nev. 2021). However, if a prison official has the

1  authority to grant the inmate's request but denies a constitutionally required request or is

2  aware of a denial that constitutes a violation and fails to act, they are considered to have

3  personally participated. *See Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012); *Blake*

4  *v. Thomas*, 2024 WL 5205741, at *1 (9th Cir. 2024). If, on the other hand, the official has

5  no authority to grant the request, denial of the grievance does not constitute personal

6  participation. *Blake*, 2024 WL 5205741, at *1.

7  **1.    Williams' Tamsulosin Prescriptions**

8  The Court will now address the extent of Keast's and Mitchell's involvement with

9  Williams' Tamsulosin prescriptions. Defendants argue they could not have been

10  personally involved with this aspect of Williams' claim because neither worked in NNCC's

11  pill room nor directly oversaw its operations. (ECF No. 75 at 14.) Thus, they "were [n]ever

12  responsible for entering requests for refills of medications or delivering medications to

13  inmates in segregation." (*Id.*) The Court agrees.

14  In his declaration, Keast states he "did not directly supervise the NNCC Pill Room"

15  and "was not involved in Williams' care at all until [he] assisted in drafting a response to

16  one of Williams' second level grievances in 2022." (ECF No. 75-6.) Similarly, Mitchell

17  states in her declaration that she was never assigned to the pill room while employed at

18  NNCC and "did not assist Pill Room staff with Pill Call in 2021, nor did [she] assist them

19  in triaging any kites referred to the Pill Room." (ECF No. 75-7 at 4.) Mitchell further states

20  that her only involvement with Williams' care in 2021 was triaging a kite in August 2021

21  and treating him on December 16, 2021. (*Id.* at 3-4.)

22  The kite Mitchell triaged dealt with Williams' request for a urinal container and an

23  egg crate mattress, which are both unrelated to the pill room and Williams' Tamsulosin

24  prescription. (ECF No. 77-1 at 83.) As to the December 16, 2021 visit, although Williams

25  told Mitchell he had been out of his Tamsulosin for 10 days, he does not allege she was

26  the cause of him being without Tamsulosin. Indeed, Williams agrees Mitchell spoke to a

27  provider who ordered a refill of his Tamsulosin. (ECF Nos. 84 at 4; 77-1 at 214, 260.) The

28  only facts Williams' disputes regarding that visit involve his catheter, which the Court will

13

1    address below. (*See* ECF No. 84 at 8-9.)

2    Keast's and Mitchell's statements are supported by Coss, the pill room supervisor,

3    who states in her declaration Keast never triaged kites referred to the pill room nor directly

4    supervised its operations. (ECF No. 75-4 1, 6.) Coss further states that she "cannot recall

5    a time that Ms. Mitchell assisted with triaging kites referred to the Pill Room, nor . . . any

6    time that she assisted with pill call." (*Id.* at 6.) Given this evidence, Defendants have

7    carried their initial burden of showing they did not personally participate in the filling of

8    Williams' Tamsulosin prescriptions, and the burden now shifts to Williams to produce

9    evidence showing there is a dispute of material fact regarding Defendants' participation.

10   *See Nissan Fire & Marine Ins. Co, Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th

11   Cir. 2000).

12   Williams makes several arguments in response. First, Williams argues there is a

13   dispute of material fact regarding Defendants' participation in the refill of his Tamsulosin

14   because the relevant medical records "were often not signed by the responding medical

15   staff," thus "making it impossible" to know who was or was not involved. (ECF No. 12-13.)

16   Williams points to his declaration, in which he states he "consistently requested refills of

17   [his] Tamsulosin . . . on separate inmate request forms which [he] did not receive

18   responses to nor copies of," and that those requests "do not appear in [his] medical file."

19   (ECF No. 84-11 at 2.) Williams also points to parts of Mitchell's and Dr. Naughton's

20   deposition testimony where they state records are unclear or that medical staff not directly

21   involved nevertheless have access to patient records. (ECF No. 84 at 13; *see also* ECF

22   Nos. 84-5 at 4, 7-10; 84-12 at 3.)

23   Second, Williams cites to *Morris v. Mitchell*, where the district judge held Mitchell

24   and Keast could not "defeat participation by merely pointing to an unsigned kite that was

25   received by prison officials." 2025 WL 732356, at *5 (D. Nev. 2025). Third, Williams

26   argues Keast was placed on notice of the issues with Williams' Tamsulosin prescription

27   when he responded to Williams' second-level grievance and kite in 2022, and his failure

28   to act constitutes participation. (ECF No. 84 at 14.) The Court will address each argument

in turn.

Beginning with the incomplete records, Williams' argument misses the point. Defendants argue they could not have participated in any delay in refilling Williams' Tamsulosin prescriptions because they did not work in the pill room and therefore had no responsibility for processing refill requests or delivering refills to inmates in segregation. The Court agrees with Williams that many of the documents in his medical record do not clearly identify which staff member handled them. However, the list of possible staff members would be confined to those working in the pill room, which could not have been Defendants since it is undisputed they never worked in the pill room. Without evidence showing Defendants were involved in pill room operations in some capacity, Williams cannot show personal participation with regard to his Tamsulosin prescriptions.

Williams' reliance on *Morris* is unpersuasive for similar reasons. In *Morris*, the district court found Defendants failed to carry their burden in part because they "failed to submit any evidence, such as a declaration, stating what job title, role, and responsibilities Defendants Keast and Mitchell held during the period at issue." 2025 WL 732356, at *5. The only evidence was that somebody in the medical department received the kite at issue, and that Keast and Mitchell both worked in the medical department. *Id.* Naturally, then, the district court found Keast and Mitchell could not be ruled out as the person who received the kite. *Id.* Here, on the other hand, Defendants submitted evidence establishing they were not responsible for pill room operations and therefore could not have been involved with refilling Williams' Tamsulosin prescriptions. Furthermore, in *Morris* the plaintiff alleged he personally told Keast about his medical issue. *Morris*, 2025 WL 732356, at *5. Williams makes no such allegation.

Finally, regarding the second-level grievance and kite Keast responded to, the Court finds that is insufficient to establish personal participation. Both the grievance and kite were about Williams' not having his Tamsulosin in December and having to get a catheter placed as a result. (ECF Nos. 84-10 at 4; 4 at 19-32; 84-3.) Although Keast was involved in responding to both, that does not mean he personally participated in the past

events. To the extent the kite and grievance put Keast on notice regarding future delays, those delays are not properly before the Court as already discussed.

Accordingly, because Williams has failed to rebut Defendants' evidence that they were not involved in or responsible for pill room operations, Williams has failed to meet his burden on summary judgment to establish an issue of fact. Therefore, the Court finds Defendants are entitled to summary judgment on the issue of delay in refilling Williams' Tamsulosin prescriptions.

### 2.    Williams' Catheter

Williams concedes Keast was not involved with the placement or subsequent care of his catheter. (ECF No. 84 at 15.) Thus, the only question is whether Mitchell personally participated in failing to replace Williams' catheter or drainage bag during the 12 days it was in. The Court finds she did not.

In her declaration, Mitchell states that after she placed Williams' catheter on December 16, 2021, she "was not involved in Williams' care again until the following year." (ECF No. 75-7 at 4.) Mitchell's statement is supported by the record. After having his catheter placed, Williams' medical record shows he submitted two kites for issues related to his catheter. (ECF No. 77-1 at 63, 69.)

First, on December 22, 2021, six days after his catheter was placed, Williams submitted a kite requesting to see a doctor about his catheter because he thought he had an infection due to the "puss that's now showing" and "excruciating pain" he was in. (*Id.* at 69.) Williams addressed the request to Mitchell which might suggest personal participation. (*Id.*) However, in his requests for admission, Williams asked Mitchell to admit that he "submitted an inmate request form on December 22, 2021 for medical attention related to his foley catheter." (ECF No. 84-4 at 6.) Mitchell responded that she had "no personal knowledge" of the request form, but did admit Williams had submitted the kite based on her review of his medical record. (*Id.*) Thus, although the kite was

1    addressed to Mitchell, the evidence indicates Mitchell did not see nor process the kite.[4]

2    Second, on December 28, 2021, Williams submitted a kite to have his catheter

3    "looked at for possible removal," noting that he had fallen to his knees earlier in the week

4    (presumably from pain) and would "explain in detail when [he saw] a doctor." (ECF No.

5    77-1 at 63.) The kite was not addressed to anyone specific; rather, the "medical" box was

6    checked. (*Id.*) As with the earlier kite, in his requests for admission Williams requested

7    that Mitchell admit he submitted the kite. (ECF No. 84-4 at 6-7.) Mitchell again responded

8    she had "no personal knowledge" of the kite but admitted the kite had been submitted

9    based on her review of Williams' medical record. (*Id.*) Thus, the available evidence

10   indicates Mitchell did not personally deal with Williams' two requests for catheter care or

11   otherwise care for Williams' catheter after initially placing it. The burden now shifts to

12   Williams to introduce evidence which disputes Mitchell's lack of participation.

13   Williams offers no evidence indicating Mitchell was involved with the care of his

14   catheter once she placed it. Rather, Williams argues Mitchell personally participated

15   because she failed to properly educate him on how to care for his catheter and did not

16   issue him enough drainage bags. (ECF No. 84 at 15-16.) However, as discussed above,

17   the issue of whether Mitchell properly educated Williams or issued him enough bags is

18   beyond the scope of the complaint. Accordingly, because Williams has failed to carry his

19   burden, the Court finds Defendants are entitled to summary judgment on the basis they

20   did not personally participate in the care of Williams' catheter during the 12 days he had

21   ──────────────
     [4]    Even assuming Mitchell had personally participated she could not be held liable
22   for failing to remove or replace Williams' catheter because she had no authority to do so.
     The day before Williams submitted the inmate request form, he had been seen by Dr.
23   Halki in response to a man down he called for pain in his bladder. (ECF Nos. 77-1 at 271;
     75 at 7; 84 at 5.) It is undisputed that Dr. Halki ordered the catheter to remain in place
24   pending urine culture results. (ECF Nos. 75 at 7; 84 at 5.) Furthermore, it is undisputed
     that it is "not within the scope of registered nursing practice to remove or replace [a]
25   catheter without a physician's order, or with a physician's order to the contrary." (ECF
     Nos. 84 at 6; 75 at 8.) Thus, with Dr. Halki's order for Williams' catheter to remain in place,
26   Mitchell had no authority to remove or replace it. *See Blake v. Thomas*, 2024 WL
     5205741, at *1 (9th Cir. 2024) ("[I]f an officer lacks authority to grant the request, the
27   officer's denial does not qualify as direct personal participation and he cannot be
     individually liable.").
28

1    it.[5]

2    **IV.    CONCLUSION**

3         **IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment,

4    (ECF No. 75), is **GRANTED**.

5         **IT IS FURTHER ORDERED** that the Clerk **ENTER JUDGMENT** in favor of

6    Defendants and **CLOSE** this case.

7         **DATED**: <u>December 15, 2025</u>.

8                                        _____

9                                        **UNITED STATES MAGISTRATE JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

---

28    [5]    Because the Court's conclusion regarding Defendants lack of participation is dispositive, the Court will not address Defendants' remaining arguments.

18